THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-00980-PAB-KMT

MELISSA RENEE GOODALL, JEREMY WAYDE GOODALL,
SHAUNA LEIGH ARRINGTON, JEFFERY PHILLIP
ARRINGTON, KARLA JO KROEKER, RYAN MARK TIPPLE,
REP. DOUGLAS LAMBORN, and LAMBORN FOR CONGRESS,

      Plaintiffs,

      v
.
WAYNE W. WILLIAMS, in his official capacity as Colorado Secretary of State,

      Defendants.

---

## [PROPOSED] INTERVENORS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

The Proposed Intervenors Respond to the Motion for Preliminary Injunction.

## I. Laches bars injunctive relief because Lamborn knew about, but failed to timely pursue, his federal claims.

Lamborn asks this court, on an extraordinarily compressed timeframe, to issue a mandatory injunction that not only strikes down state law, but also orders Lamborn to be placed on a state ballot. To reach the merits of Lamborn's claim for injunctive relief, the court must first find that Lamborn timely presented this claim. He hasn't.

### A. Despite highly compressed election deadlines, Lamborn chose not to follow the Colorado Supreme Court's mandatory rule to timely assert his federal claims.

Lamborn began circulating petitions in February 2018. After submitting signatures to the Secretary, he received from the Secretary a statement of sufficiency notifying him that he had submitted an adequate number of signatures. A complaint that challenged this statement under Section 1-1-113 of the Colorado Election Code was

1

filed on April 3. Lamborn's response to this complaint asserted the constitutional challenge to circulator residency requirements that he now re-raises here. Attached p. 12-14 (Exhibit A).

Last September, in a widely-publicized decision, the Colorado Supreme Court held that constitutional claims under 42 U.S.C. § 1983 could not be asserted in state proceeding under § 1-1-113. *Frazier v. Williams*, 401 P.3d 541, 543 [¶ 10] (Colo. 2017). Under *Frazier*, "When a section 1983 claim is brought in a section 1-1-113 proceeding, the district court should dismiss the claim without prejudice with leave to refile it in a separate action, which should then be assigned, where possible, to the same judge." *Id.* at 545 [¶ 19]. Lamborn did not follow this mandatory procedure. Instead, he improperly raised his federal claims as an affirmative defense, and then waited to pursue his federal claims in the case now at bar until after the Colorado Supreme Court rejected his petition signatures. After the Colorado Supreme Court ordered his name off the ballot, Lamborn sued in this court on Wednesday evening, just two days before the ballot certification deadline on Friday, April 27.

As Lamborn's motion for injunctive relief shows, the potential constitutional deficiencies of circulator-residency requirements are well-known. Lamborn knew about this requirement before he began circulating petitions. *See Schwab v. Reilly*, 560 U.S. 770, 790 (2010) *citing United States v. Budd*, 144 U.S. 154, 163 (1892) ("every man is presumed to know the law."). But Lamborn did not assert his constitutional claims then or properly assert them in state court as part of the Section 113 proceedings that put his place on the ballot at risk. He asserted his constitutional claims in federal court only after litigating in state court for over three weeks, and then only after the Colorado Supreme Court struck signatures that otherwise would have kept him on the primary ballot. In those three weeks, Lamborn knew his place on the ballot was at risk, but he nonetheless asserted his constitutional claims only in a state proceeding that could not consider them. Despite the risk—and the stakes—Lamborn dallied.

In the highly compressed timeline for ballot-access challenges, the months during which Lamborn circulated petitions—and the weeks that he litigated in state court—make a profound difference. Because elections take place against a running clock with a firm deadline, "[d]iligence in the compressed timeline applicable to elections is measured differently from how it might be measured in other contexts." *Voters Organized for the Integrity of Elections v. Baltimore City Elections Bd.*, 214 F.Supp.3d 448, 454 (D. Md. 2016) (laches justified dismissing complaint asserting various constitutional challenges to primary election results). As the Seventh Circuit recently put it, "[t]he obligation to seek injunctive relief in a timely manner in the election context is hardly a new concept. We previously have suggested that claims must be brought 'expeditiously.'" *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1060-61 (7th Cir. 2016) (laches barred ballot-access preliminary injunction for term-limits initiative), citing *Williams v. Rhodes*, 393 U.S. 23, 34–35 (1968). *See also Arizona Libertarian Party v. Reagan*, 189 F.Supp.3d 920, 922 (D. Ariz. 2016) (collecting Arizona cases emphasizing need to timely bring election-related challenges).

### B. Laches bars the requested injunction because Lamborn did not expeditiously asserted his constitutional claims.

Courts have regularly refused to grant ballot-access injunctions when candidates have asked courts to intervene at the last second to save them from the consequences of their own delay. This is such a case. Such last-second, "Hail Mary" passes to a federal court are barred by laches.

Laches "stems from the principle that 'equity aids the vigilant and not those who slumber on their rights.'" *Biodiversity Conservation Alliance v. Jiron*, 762 F.3d 1036, 1090-91 (10th Cir. 2014), quoting *Kansas v. Colorado,* 514 U.S. 673, 687 (1995). It bars a dilatory claim if (1) the party asserting the claim lacked diligence and (2) a party defending a claim is prejudiced. *Id.* at 1091.

In particular, courts have regularly found that laches bars injunctive relief for ballot access when the injunction threatens to disrupt an orderly electoral process. This case is on all fours with a well-known ballot access case from the Fourth Circuit decided on laches. The Fourth Circuit's unpublished, but oft-cited, opinion in *Perry v. Judd*, details why. In *Perry,* then-Presidential Candidates Rick Perry and Newt Gingrich challenged Virginia's long-standing residency requirement for petition circulators after the candidates failed to gather enough valid signatures to qualify for the ballot. *Perry v. Judd*, 471 Fed.Appx. 219 (4th Cir. 2012). They sought a mandatory injunction requiring their names to appear on the ballot. *Id.* at 220 and 223-24 (mandatory nature of injunction). The Fourth Circuit upheld the district court's denial of the injunction. It noted the district court's finding that the candidates' failure to challenge this requirement months earlier, when they first began circulating petitions, "displayed an unreasonable and inexcusable lack of diligence." *Id.* at 222. *Perry* found that "[t]his deliberate delay precludes the possibility of equitable relief," and concluded that an injunction would "encourage candidates . . . who knew the requirements and failed to satisfy them to seek at a tardy and belated hour to change the rules of the game," which "would not be fair to the states or to other candidates who did comply with the prescribed processes in a timely manner." *Id.* at 224 and 220-221. By the same reasoning, Lamborn's delay is unfair to candidate Owen Hill, among three other candidates, who timely complied with Colorado's prescribed processes.

Other circuits have mirrored *Perry's* reasoning and its result. Over twenty-five years ago, the Seventh Circuit found that laches barred injunctive relief that a plaintiff sought eleven weeks after the challenged electoral actions were of public record and two weeks after it had received actual notice of them. *Fulani v. Hogsett,* 917 F.2d 1028, 1031 (7th Cir. 1990). Less than two years ago, the Seventh Circuit upheld a district court's decision that laches barred injunctive relief where nearly three months had

elapsed between the challenged action and plaintiff's lawsuit. *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1062 (7th Cir. 2016). In doing so, it noted that the Sixth Circuit has found that laches barred injunctive relief where a plaintiff waited twenty-five days before it filed suit. *Id.* at 228, n.2*, citing Kay v. Austin,* 621 F.2d 809, 813 (6th Cir. 1980).

Lamborn's suit is just like Perry and Gingrich's suit. Like Perry, Lamborn: (1) asserts a constitutional challenge to circulator residency requirements; (2) does so only after he fell short of the signatures required to make the ballot; (3) knew about the potential constitutional issues when he began circulating his petitions; and (4) seeks a highly disfavored mandatory injunction.[1] Unlike Perry, Lamborn is an electorally seasoned U.S. Congressman, who seeks to be re-elected in a state with familiar election laws and who presumably had ample resources to bring a separate lawsuit in federal (or state) court. Lamborn's unjustified delay is even worse than Perry's delay. Lamborn got a warning shot. He faced a state-court challenge to his signatures over a month ago, but *still* chose not to challenge Colorado's circulator residency requirements in state or federal court. This fact alone makes Lamborn's slumber more inexcusable than Perry's.

Lamborn's lack of diligence is apparent. The resulting prejudicial effect of his dallying is just as real. Failing to follow the rules disadvantages candidates, like Hill, who did follow them. *Perry v. Judd*, 471 Fed.Appx. 219, 220-221 and 224 (4th Cir. 2012). Another significant prejudice of delay in election cases is "the quality of

---

[1] *See Schier v. University of Colorado*, 427 F.3d 1253, 1261 (10th Cir. 2005) (injunction seeking to reinstate terminated university department chair was mandatory because it "affirmatively require[s] the nonmovant to act in a particular way, and as a result ... place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction") and 1259 (disfavored mandatory injunctions "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course.").

decisions in matters of great public importance." *Arizona Libertarian Party v. Reagan*, 189 F.Supp.3d at 923, quoting *Sotomayor v. Burns*, 13 P.3d 1198, 1200 [¶ 9] (Ariz. 2000). Unwarranted delay forces judges to "steamroll through . . . delicate legal issues to meet election deadlines," rushes appellate review, and deprives defendants of time to consider and develop their case. *Id.* (citations/internal quotations omitted). A general harm to the electoral system also establishes prejudice. *Qualkinbush* 842 F.3d 1053, 1062 (7th Cir. 2016) ("district court certainly did not abuse its discretion in determining that the harm to the electoral system caused by the plaintiffs' delay outweighed any countervailing harm to the Petition Plaintiff.").

Here, Lamborn's delay left intervenors and any other potentially interested party with only a day to move to intervene and twenty-four hours to respond to a complex mandatory-injunction motion. Assembling support for the constitutionality of circulator-residency requirements is impossible in this time frame. And the time available did not allow intervenors to thoroughly develop their opposition to Lamborn's proposed injunction. If Lamborn had properly asserted his constitutional claims in a parallel state-court proceeding, as *Frazier* requires, the state-court plaintiff, Kuhn, and other interested parties could have addressed these claims then, at a less self-defeating pace, so that Lamborn could not negate their considerable efforts by belatedly asserting his constitutional claims in federal court.

To be sure, many of the ballot-access cases that deny injunctive relief involve candidates in slightly different circumstances, such a differing ballot printing deadlines. *E.g. Perry, supra* at 227 (requested injunction "would force expensive reprinting of ballots") and 227-28 (collecting U.S. Supreme Court cases disapproving of disruptions of ordinary election process). These minor distinctions do not negate or diminish Lamborn's complete lack of diligence in asserting his constitutional claims. Lamborn may well ask this court, after all, for a remedy delaying or changing ballot printing in Colorado.

*Perry* involved two credible presidential candidates in the state of Virginia: the sitting Texas Governor and the former Speaker of the U.S. House of Representatives. This case involves a sitting U.S. Congressman. But the maxim of Napoleon (George Orwell's pig in Animal Farm, not the French autocrat) that "All people are equal, but some are more equal than others," George Orwell, ANIMAL FARM, has no place in a government of laws: "[T]he rule of law implies equality and justice in its application." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 171 (1972).

## II.  This court lacks jurisdiction to order Lamborn placed on the Colorado primary election ballot.

Before reaching the merits of the constitutional issue raised by Plaintiffs this court must first have jurisdiction to decide the case. For two independent reasons this court lacks jurisdiction to provide the central relief requested by Lamborn—ordering a state official to place his name on the ballot. This court need not reach the question of the likelihood of success on the constitutional question.

### C.  Under the *Pennhurst* doctrine federal courts lack jurisdiction to order state officials to comply with state law, and place a candidate on the ballot.

Lamborn seeks a preliminary injunction on a rushed basis because four days ago the Colorado Supreme Court issued a unanimous, per curiam opinion, concluding the Secretary of State "may not certify Representative Lamborn to the 2018 primary ballot for CD5." *Kuhn v. Williams*, 2018 CO 30, ¶ 57, Lamborn seeks to overturn this decision through a separate federal lawsuit. The Motion for Preliminary Injunction seeks to collaterally attack this state law decision: "Plaintiffs respectfully submit that they are entitled to an order of this Court certifying Mr. Lamborn to the 2018 Republican Primary ballot for CD5." This is a misuse of the federal courts.

The Supreme Court has rejected attempts to use federal courts as substitute courts of general jurisdiction over state officials: "it is difficult to think of a greater

intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Pennhurst State School & Hosp. v. Halderman*, 465 US 89, 106 (1994). The only relief sought in this preliminary injunction proceeding is precisely the type of impermissible order for a state official to comply with state law (by placing his name on the ballot, as Colorado state courts routinely do under C.R.S. § 1-1-113 and related Election Code provisions).

*Pennhurst* has been applied in a nearly identical federal case as Lamborn's, where candidates circulated candidate petitions and sought a federal court order placing them on the ballot. *Citizens for John W. Moore Party v. Board of Election Com'rs of City of Chicago*, 781 F.2d 581 (7th Cir. 1986). Relying on *Pennhurst*, the federal court refused to order the state official to place the candidate on the ballot according to state law (instead, over dissent, certifying a question to state court):

> A federal court may order prospective relief based on a violation of the constitution or of federal law, but it may not order state officials to comply with state law. Anyone who wants a judicial order compelling state officials to abide by state law must seek that relief in state court.

> Moore wants an injunction against the operation of § 10–4. An order carving candidates out of the scope of § 10–4 would give him partial relief. Under *Pennhurst* we cannot direct state officials to provide that partial relief on the basis of state law. .... The fact that the construction of state law has been supplied in the very case under review would not enlarge the federal court's power.

*Id.* at 584-85.

In another closely analogous federal election case, plaintiffs filed a federal lawsuit shortly after a state court had ruled on an election law issue. The Sixth Circuit stated that under *Pennhurst*, the federal district court lacked jurisdiction to interpret state law and grant relief in the case, since "federal courts lack jurisdiction to enjoin state

officials on the basis of state law." *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008) (court ultimately assumed a federal law basis to reach and reject the merits). Lamborn seeks the same type of prohibited federal court interference with state officials' compliance with election law; directly asking for an order to put his name on a ballot. Colorado state law controls this process and Lamborn had ample opportunity to seek redress in state court on this precise point.

The need for judicial restraint prevents a federal court from ordering a state election official to take action, and this comports with other well-known principles of federal court jurisdiction. As the Supreme Court stated in *Michigan v. Long*, "[r]espect for the independence of state courts, as well as avoidance of rendering advisory opinions, have been the cornerstone of this Court's refusal to decide cases where there is an adequate and independent state ground." *Michigan v. Long*, 463 U.S. 1032, 1040 (1983). Lamborn recently litigated Colorado's circulator requirements and developed a factual record concerning specific circulators, and the Colorado state court's final ruling against Lamborn all point to a jurisdictional bar in this case. The constitutional attack on residency provisions does nothing to mollify this jurisdictional defect. The state district court struck one of Lamborn's circulators (which Lamborn did not appeal), and the Colorado Supreme Court struck another circulator. Both provide an independent state law basis for rejecting the signatures collected by the two circulators who were shown, with testimony, to have untruthfully or fraudulently executed sworn affidavits on circulated petitions.

### D. Lamborn does not have standing to have his name placed on the ballot, because his request for preliminary injunction is not redressable.

In this case, Lamborn seeks both declaratory and injunctive relief. He asks that this Court invalidate Colorado's residency requirements, and he also asks that this court issue a preliminary injunction placing his name on the ballot. Although

Lamborn may have standing to assert a claim for declaratory relief, he does not have standing to seek injunctive relief placing his name on the ballot. And the only circulator in the case, Mr. Tipple, makes no allegation or claim in the Complaint that he intends to ever circulate in Colorado in the future; so there is no standing or ripeness for him to ask this court for an emergency preliminary injunction. [ Doc. #1, ¶ 17-18]. Indeed, all of the non-Lamborn plaintiffs may pursue their claims for declaratory action, after the election, even if this court denies the injunctive relief requested to place Lamborn on the ballot.

As a general matter, a plaintiff may have standing for a portion of a case, but not all. It is well established that a court may deny injunctive relief on standing grounds, even though a plaintiff may have standing to seek damages and declaratory relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 97-98 (1983). In that case, the complaint sought damages or declaratory relief, but like here, one claim sought injunctive relief. Although the Supreme Court recognized standing for damages and declaratory relief, it nonetheless held that the plaintiffs did not have standing for injunctive relief. *Id.* at 107. Lamborn, similarly, has no standing for injunctive relief.

A plaintiff lacks standing when a court cannot grant the relief they request: "It is not enough to satisfy Article III standing requirements that the plaintiff have suffered an injury in fact, caused by the challenged actions of the defendant. In addition, the plaintiff must show that some personal benefit will result from a remedy that the court is prepared to give." WRIGHT, MILLER AND COOPER, FEDERAL PRACTICE AND PROCEDURE, §3531.6. Remedial Benefit and Implied Cause of Action (West 2018). In the leading case *Warth v. Seldin*, the Supreme Court unambiguously held that "The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally." 422 U.S. 490, 499 (1975). There, the Court presumed a zoning statute was likely unconstitutional, but nonetheless denied standing because the plaintiffs

could not show that they "personally would benefit in a tangible way from the court's intervention." *Id.* at 491. Since then, the Supreme Court has readily denied standing when a claim is not redressable. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 568-571 (1992). The Tenth Circuit has followed this well-established principle, holding that plaintiffs lack standing if their claims fail to "meet[] the constitutional requirement of redressability," *State ex rel. Sullivan v. Lujan*, 969 F.2d 877, 881–882 (10th Cir. 1992), as have many cases in other circuits. *See, e.g.*, *Boating Industry Ass'n v. Marshall*, 601 F.2d 1376 (9th Cir. 1979); *Greater Tampa Chamber of Comm. v. Goldschmidt*, 627 F.2d 258 (D.C. Cir. 1980).

In particular, Lamborn does not have standing to assert a preliminary injunction placing him on the ballot, because this Court cannot afford the relief Lamborn seeks. Lamborn seeks to invalidate Colorado's circulator residency requirement. He may also seek to invalidate Colorado's party-affiliation requirement. But this is not enough to obtain relief. Lamborn's circulators also violated Colorado's truthfulness requirements, when they swore on petition affidavits that they were Colorado residents, when in fact they were not. The circulator affidavit on each petition section is of paramount importance to the entire petition process in Colorado election law. In fact, the Secretary will reject an entire petition section if a circulator affidavit is, on its face, defective. *See* 8 CCR 1501-1, Rule 15.1.3(a). Lamborn has challenged Colorado's residency requirements. He has *not* challenged Colorado's truthfulness requirements for circulator affidavits on each petition section. But his circulator petitions are invalid under both requirements.

Lamborn's petition circulators not only violated Colorado's specific residency requirements, they also violated Colorado's requirement that circulators truthfully and accurately affirm that they were residents and registered voters. C.R.S. § 1-4-905(2) (detailing affidavit requirement). To be sure, the same factual finding of non-residency caused Lamborn's circulators to violate, independently, both the residency

requirement and the circulators' affirmation of residency. But circulator truthfulness and accuracy is just as critical to the candidate petition process as residency or party affiliation.

As explained in the *Motion to Intervene*, the Colorado Supreme Court has on multiple occasions emphasized the critical role circulators have in ensuring the integrity of the signature collection process: "We have concluded that the statutory requirement that circulator affidavits be "notarized" in the generic sense—that is, executed under oath before a person authorized to authenticate signatures—is appropriately designed to protect against mistake, fraud or abuse in the initiative process and does not unduly restrict the right of citizens to participate in that process." *Comm. for Better Health Care for All Colorado Citizens v. Meyer*, 830 P.2d 884, 897 (1992). Likewise, "circulators bear significant personal responsibility to prevent irregularities in the initiative process." *Loonan v. Woodley*, 882, 1380, 1384 (Colo. 1994). The circulator affidavit not only ensures truthfulness—it also guards against mistakes and abuse. In short, the affidavit plays a very important role in ensuring that circulators fulfill their duties.

Although much of this case—in the media and before the Colorado Supreme Court—has focused on the factual findings about residency factors, the Kuhn Intervenors expressly and repeatedly challenged Lamborn's signatures because his circulators misrepresented the fact that they were Colorado residents. Specifically, the Kuhn Intervenors claimed that "The Protest rests on three separate grounds" and that "a circulator must affirm that he or she is a resident of the state." Petitioner's Trial Br, p. 2, (Denver Dist. Ct. April 2017) (Exhibit B). They quoted Colorado law, which states:

> To each petition section shall be attached a signed, notarized, and dated affidavit executed by the person who circulated the petition section, which shall include: The affiant's printed name, the address at which the affiant resides, including the street name and number, the

city or town, the county, and the date of signature; a statement that the affiant was a resident of the state . . . C.R.S. § 1-4-905(2).

Indeed, the Kuhn Intervenors argued in their trial brief that "the petition circulators' residence in Colorado was nothing more than a sham, and that those circulators misrepresented this fact in their affidavits." *Id.* And in response to a motion to dismiss, the Kuhn Intervenors argued—under the heading "[t]his Court may review residency, registration, and circulator fraud" —that their "challenge is not limited to the circulators improper registration as voters. Rather [Colorado law] *independently* requires that circulators . . . affirm that they are, in fact, Colorado residents." (emphasis added). Petitioner's Resp. to Mot. to Dismiss, pp. 5-6, (Denver Dist. Ct., April 2017) (Exhibit C).

As a result, even if this court were to declare Colorado's residency requirements unconstitutional, it cannot order Lamborn to be placed on the ballot. Lamborn has not challenged Colorado law that requires a circulator to truthfully affirm that he or she is a resident and registered, affiliated voter, and such a challenge would be futile, as the state interest in truthful and honest circulators is sound. The fact is, Lamborn's circulators violated the affirmation requirement in Colorado law. Their signatures were properly struck on these independent grounds of being untruthful; engaging in fraud. And this fraud is plain. As detailed below, Plaintiff Tipple now admits, in this federal lawsuit, that his statements and positions in the state court litigation, just days ago, amount to fraud. In Colorado state court, Tipple swore to Colorado as his primary residence (a claim ultimately rejected based on the overall evidence in the case), whereas Tipple now represents himself in this Complaint as having California as his primary residence. [Doc. #1, ¶ 17.] The judicial admissions highlight the false affidavit claims made on Colorado petitions; properly rejected as fraudulent, irrespective of any constitutional declaration.

Because this Court cannot undo the false affidavits, there is no way to rehabilitate signatures collected under a false circulator affidavit. The state law mechanism for ordering acceptance of particular signatures is not before this court. C.R.S. § 1-1-113 (exclusive remedy for petition challenges). Therefore, the court cannot place Lamborn on the ballot, because striking Colorado's residency requirement, after Lamborn's circulators have engaged in fraud, cannot force any state official to put Lamborn's name on the ballot.

III.    **There is no probability of success on the merits.**

Plaintiffs cannot show a probability of success on the merits for three reasons.

A.    **Lamborn's circulators fraudulently executed circulator affidavits, and this provides an independent basis for rejecting gathered signatures.**

Colorado has an interest in circulators being truthful in executing circulator affidavits; that mechanism ensures that circulators personally gather and witness signatures, and that they did not offer anything in exchange for the signature, and other requirements. *See* C.R.S. § 1-4-905 (listing circulator requirements). If circulators cannot be trusted to tell the truth on the affidavit, then there is no justification for accepting any of the signatures they have gathered. *See* 8 CCR 1501-1, Rule 15.1.3(a) (rule for striking signatures for circulator irregularities). In this case the undisputed evidence in state court showed that at least two of Lamborn's circulators engaged in fraud when executing the circulator affidavits. Lying on the affidavit is an independent basis for rejecting the signatures that cannot be fixed by declaring a residency standard unconstitutional. Whether this court or the Tenth Circuit ultimately finds the residency requirement constitutional does nothing to change the fraudulent conduct of these circulators. The case is readily distinguished from the cases where potential circulators challenge a residency restriction. The First Amendment does not justify fraudulent circulator conduct.

Ryan Tipple's conflicting claims in this case and the final state court decision amply highlight the issue. Lamborn's attorneys claimed before trial, "the challenged professional petition circulators are and were Colorado residents" (Lamborn Resp. to Petition), and when asked if he considered himself a resident at the time he circulated petitions, he responded, "in a long-term sense, yes." On each petition affidavit he circulated, he "solemnly affirm[ed] under penalty of perjury that … I was a resident of Colorado …. at the time this section of the petition was circulated and signed by the listed electors." C.R.S. § 1-4-902. Each time he swore he was a resident, it was untruthful. As the Colorado Supreme Court found, based on Mr. Tipple's testimony and evidence presented, "we conclude that Tipple was not a Colorado resident when he acted as a circulator for the Lamborn Campaign." 2018 CO 30, ¶ 30, because his "principal or primary home or place of abode of a person," was not in Colorado. C.R.S. § 1-2-102(a). This primary, fixed, residence is also confirmed by objective factors in the statute, C.R.S. § 1-2-102(b), which in Tipple's case all pointed towards California. So overwhelming was the evidence that Tipple was a resident of California, not Colorado, the conclusion was inescapable that he not only failed the legal requirements, but he was untruthful when he swore on each petition circulation affidavit that, at the time he circulated he "was a resident of Colorado."

Up until the Colorado Supreme Court rejected Lamborn's arguments, Tipple claimed to be a Colorado resident. And now in federal court, Tipple, a Plaintiff, alleges in the Complaint that "the current primary or principal place of abode of Ryan Mark Tipple is 12376 Teal Avenue, Ventura, California 93003." [Doc. #1, ¶ 17]. This admission is doubly problematic for Tipple's argument. First it proves the fraud he committed when swearing on each circulator affidavit that he was a Colorado resident. It is, literally, the opposite of complying with Colorado law which states "The residence of a person is the principal or primary home or place of abode."

For the same reason, Tipple now admits that his Colorado voter registration and affiliation is, also, a fraud. In the same paragraph of the Complaint in this court Tipple asserts that he "is a registered Colorado voter and is affiliated with the Republican Party." *Id.* That, as a matter of law, cannot be when he admits in court, today, not last week, that he is in fact a California resident. Accordingly, Tipple now admits that his Colorado voter registration and affiliation is, also, a fraud.

The issue of circulators untruthful execution of circulator affidavits is an independent and separate legal flaw in Lamborn's case before this court. The Colorado district court was well apprised of the legal requirements in Colorado law and based on the evidence, the circulators lied on the circulator affidavits. This Court cannot remedy this untruthfulness by declaring the residency requirements unconstitutional. A declaration does not mollify the active fraud these circulators committed. And these false statements, combined with the state interest in preventing fraud satisfies any level of scrutiny. "Despite the strong protection for political speech under the First Amendment, the Supreme Court has acknowledged that a state interest in preventing fraud 'carries special weight during election campaigns when false statements, if credited, may have serious adverse consequences for the public at large.'" *281 Care Comm. v. Arneson*, 766 F.3d 774, 786 (8th Cir. 2014) (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 349 (1995)).

**B. Colorado has a strong interest in protecting the associational rights of political party members by restricting circulators to registered, affiliated voters.**

Lamborn's two stricken circulators also violated the voter affiliation requirement for a partisan primary. This presents a question of state power to protect the membership of political parties, not the right of petition circulators to engage in political speech. Because the primary petition circulators are not properly registered members of the Colorado Republican Party, they have no right to participate in the

primary petition circulation process, even if the circulator residency provision are declared unconstitutional. Avoiding "party raiding" is a compelling concern. *See Rosario v. Rockefeller*, 410 U.S. 752, 756 (1973).

The registered primary voter requirement is sufficiently tailored to the state's compelling interest in preventing party raiding. Allowing non-members of the Colorado Republican Party to circulate petitions risks adulterating the candidate-selection process, the "basic function of a political party." *California Democratic Party*, 530 U.S. at 581. The narrowest way to identify members of the state party is to look at their affiliation in the statewide voter registration system. C.R.S. § 1-4-905(1).

When a citizen wants to associate with a state political party, courts frequently review limitations on that association under a low form of scrutiny, and it is uncertain whether citizens even have a traditional "interest" that invokes constitutional protection; "As for the associational 'interest' in selecting the candidate of a group to which one does not belong, that falls far short of a constitutional right, if indeed it can even fairly be characterized as an interest." *California Democratic Party*, 530 U.S. at 573 n.5. And the Supreme Court has warned that associational rights are not always subject to strict scrutiny: "But not every electoral law that burdens associational rights is subject to strict scrutiny. . . . [R]equiring voters to register with a party prior to participating in the party's primary minimally burdens voters' associational rights." *Clingman v. Beaver*, 544 U.S. 581, 592 (2005). "To deem ordinary and widespread burdens like these severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." *Id.* at 593. Party affiliation is an ordinary and widespread requirement that protects the associational interest of political parties; therefore the appropriate level of scrutiny for the affiliated vote requirement is rational basis.

In *Rosario v. Rockefeller*, for instance, the Supreme Court upheld a requirement that voters must affiliate with a political party thirty days before a primary because "preservation of the integrity of the electoral process is a legitimate and valid state goal," and the period "is in no sense invidious or arbitrary." 410 U.S. 752, 761–62 (1973). In *Clingman*, Oklahoma's law that forbade those registered with a political party to crossover and vote in another political party's primary survived a low form of scrutiny. *Clingman*, 544 U.S. at 593. Citizens who are not registered voters affiliated with the state's political party typically do not have an interest that subjects their claim to strict scrutiny.

The same holds true for petition circulators trying to associate with a state political party in its primary. In *Maslow*, the burden on circulators who were not registered voters affiliated with the state party was "little to no[ne]," because the party had a "strong associational right to exclude non-members from the candidate petition process. *Maslow v. Board of Elections in the City of New York*, 658 F.3d 291, 296 (2d Cir. 2011). And circulators who were not enrolled members of Pennsylvania's political parties had no right to interfere with the "associational wishes" of the state's political parties. *De La Fuente v. Cortés*, 261 F.Supp.3d 543, 555 (M.D. Pa. 2017).

To protect the associational interests of Colorado's political parties, under Colorado law circulators must be "affiliated with the political party mentioned in the petition at the time the petition is circulated, as shown in the statewide voter registration system." C.R.S. § 1-4-905(1). Indeed, political parties have "special protection" under the First Amendment. *California Democratic Party v. Jones*, 530 U.S. 567, 575 (2000), and states have a "major role to play in structuring and monitoring the election process, including primaries," and laws that prevent "party raiding" are appropriate. *Id.* at 572. A law that "forces petitioners to adulterate their candidate-selection process—the 'basic function of a political party,'—by opening it up to

persons wholly unaffiliated with the party" would be constitutionally suspect. *Id.* at 581.

Federal courts have upheld laws that require circulators to be registered voters affiliated with a political party as a condition of circulating primary petitions. New York, for instance, requires that primary petition circulators affirm that they are "enrolled voter[s]" in that candidate's political party. N.Y. ELEC. LAW § 6-132(2). In *Maslow v. Board of Elections in the City of New York*, 658 F.3d 291 (2d Cir. 2011), the Second Circuit upheld the law. The burden on circulators was "little to no[ne]"— circulators could speak freely on many issues, simply not by circulating primary nominating petitions. *Id.* at 296. The law legitimately targeted the concern that non-party members would try to clutter the ballot by circulating petitions for frivolous candidates and alter that party's primary, and parties have a "strong associational right to exclude non-members from the candidate petition process." *Id.* at 296.

Pennsylvania law requires that a circulator to be "a qualified elector duly registered and enrolled as a member of the designated party of the State." 25 PA. STAT. § 2869. A federal court upheld this statute, recognizing that the statute reflected that the law did not interfere with the "associational wishes" of a political party and the circulators had no right to interfere in the party's nomination process. *De La Fuente v. Cortés*, 261 F.Supp.3d 543, 555 (M.D. Pa. 2017). As these cases show, primary petition circulators have "no right" to associate with a party to which they do not belong. *Maslow*, 658 F.3d 291 at 298; *De La Fuente*, 261 F.Supp.3d at 555. Any claims of associational interests by primary petition circulators in this case likewise fail.

**C. The unique facts of this case justify Colorado's residency restriction because out-of-state circulators engage in fraudulent practices and undermine election integrity.**

Judicial scrutiny of state regulation of petition circulators is context-specific inquiries, and Colorado's sufficiently tailored law passes judicial scrutiny. Colorado has a compelling interest in "policing the integrity of its petition process," *Chandler v. City of Arvada*, 292 F.3d 1236, 1241 (10th Cir. 2002); and in "administrative efficiency, fraud detection, [and] informing voters." *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 192 (1999).

These are context-specific inquiries. Residency requirements for petition circulators have been upheld by other courts. *See, e.g.*, *Initiative & Referendum Institute v. Jaeger*, 241 F.3d 614, 616–17 (8th Cir. 2001) (finding that a residency requirement for initiative petition circulators was narrowly tailored to "ensur[e] that circulators answer to the Secretary's subpoena power"); *Kean v. Clark*, 56 F.Supp.2d 719, 732–33 (S.D. Miss. 1999) (finding that state's need to exercise personal jurisdiction over circulators and concern of drawn-out extradition process over non-resident circulators meant that a residency requirement for initiative petition circulators was narrowly tailored).

*City of Arvada* is an initiative petition case. *See also Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023 (10th Cir. 2008). The First Amendment interests are higher in initiative cases than in candidate petition cases. *See Meyer v. Grant*, 486 U.S. 414, 421–22 & n.4 (1988) (describing evidence of the kind of "interactive communication concerning political change" that rises to "core political speech"). Lamborn identifies no such "core political speech" in this case. And the state's interests in preventing fraud and corruption are not as great in initiative cases. *See Meyer*, 486 U.S. at 428 ("The risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public issue") (internal quotation omitted). Engaging in discussions of "political change" are not at issue, and no core political speech is

implicated. That means the state's law should be subject to a lower standard of judicial scrutiny.

Even if strict scrutiny analysis occurs for candidate petitions, the state has narrowly tailored the law to address the context-specific concerns of primary elections in Colorado. A residency requirement is sufficiently tailored to address short-fuse election law litigation. Challenges to petitions must be filed within five days. *See* C.R.S. § 1-4-909(1). Colorado must process ballot access disputes quickly to print and then send ballots to uniformed services voters and overseas voters under the Uniformed and Overseas Citizens Absentee Voting Act, *see* 52 U.S.C. § 20302(a)(8) (requiring transmission of ballots at least 45 days before the election). Ensuring that primary petition circulators are residents of the state is an appropriate policing of the integrity of the petition process, advances administrative efficiency, and detects fraud. It permits state courts to exercise jurisdiction over petition circulators and to avoid extradition concerns over non-residents that would delay judicial resolution of disputes. *See Initiative & Referendum Institute v. Jaeger*, 241 F.3d 614, 616–17 (8th Cir. 2001); *Kean v. Clark*, 56 F.Supp.2d 719, 732–33 (S.D. Miss. 1999).

Colorado uses multiple means of verifying the validity of signatures on petitions. Signature verification is one way of advancing that end, but it covers different concerns than concerns with fraud in petition circulators. Examination of petition circulators in court can address concerns that cannot be found due to inaccuracies in the signature verification process, or due to fraudulently-circulated petitions with forged signatures that trick the signature verification process. Colorado must be able to hear from the circulators of petitions to gather the best evidence to determine the validity of signatures on petitions. Plaintiffs' argument goes too far and would preclude a court from ever haling any circulator, resident or non-resident, into court to present evidence.

**IV.** **The public interest and equities weigh strongly in favor of denying the preliminary injunction.**

The public interest and the balance of the equities weigh strongly in favor of leaving the Colorado Supreme Court's well-reasoned judgment regarding Lamborn's petitions undisturbed. Granting an injunction will reward the untruthfulness of Lamborn's circulators and their intention to circumvent Colorado's residency requirements, allow him to obtain equitable relief despite his agent's unclean hands, and excuse his own dallying. It will also encourage future well-funded candidates to seek last-minute refuge in federal court instead of timely asserting constitutional claims, and encourage them to use delay as a tool to bulldoze opponents by forcing rushed consideration of significant constitutional issues and other issues of pubic import. The court, and opponents deserve more than days to assess potentially long-lasting decisions on issues of such consequence.

In addition to meeting the four traditional factors for injunctive relief, a movant must establish "a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint." *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010), quoting *Devose v. Herrington,* 42 F.3d 470, 471 (8th Cir.1994). Where, as here, a movant seeks a mandatory injunction, note 1, *supra*, the movant must also "make a heightened showing of the [ ] four factors." *Id., quoting Att'y Gen. of Okla. v. Tyson Foods, Inc.,* 565 F.3d 769, 776 (10th Cir. 2009).

At first glance, the relationship between Lamborn's failure to qualify for the ballot and his constitutional claims seems straightforward. It isn't, though. The alleged unconstitutionality of Colorado's circulator residency requirements did not cause Lamborn's failure to qualify for the ballot. His own dallying did. His inaction, and his inaction alone, caused his exclusion from the primary ballot. In light of this and the other factors that the intervenors have noted herein, Lamborn has not made the

heightened showing that a mandatory injunction requires, or shown that the balance of the equities favors injunctive relief.

Respectfully submitted this 27th day of April 2018,

KLENDA GESSLER & BLUE, LLC

s/ Scott E. Gessler
Scott E. Gessler (28944)
sgessler@klendagesslerblue.com
Geoffrey N. Blue (32684)
gblue@klendagesslerblue.com
Steven A. Klenda (29196)
sklenda@klendagesslerblue.com
1624 Market St., Ste. 202
Denver, CO  80202
Phone:  (720) 432-5705

STATECRAFT PLLC

s/ Michael Francisco
Michael Francisco, #39111
Statecraft PLLC
620 North Tejon Street, Suite 101
Colorado Springs, CO  80903
719.399.0890 | michael@statecraftlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following persons:

LeeAnn Morrill
First Assistant Attorney General
Matthew D. Grove
Public Officials Unit
State Services Section
1300 Broadway, 6th Floor
Denver, CO  80203

Ryan Call
Richard A. Westfall
Peter J. Krumholz
Hale Westfall, LLP
1600 Stout Street, Ste. 500
Denver, CO  80202

_____*s/ Joanna Bila*_____
Joanna Bila, Paralegal