IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No.  18-cv-00980-PAB

MELISSA RENEE GOODALL,
JEREMY WAYDE GOODALL,
SHAUNA LEIGH ARRINGTON,
JEFFERY PHILLIP ARRINGTON,
KARLA JO KROEKER,
RYAN MARK TIPPLE,
REP. DOUGLAS LAMBORN, and
LAMBORN FOR CONGRESS,

     Plaintiffs,

v.

WAYNE W. WILLIAMS, in his official capacity as Colorado Secretary of State,

     Defendant.

---

## ORDER

---

This matter comes before the Court on the Motion for Preliminary Injunction

[Docket No. 2] filed by plaintiffs Melissa Renee Goodall, Jeremy Wayde Goodall,

Shauna Leigh Arrington, Jeffery Phillip Arrington, Karla Jo Kroeker, Ryan Mark Tipple,

Rep. Douglas Lamborn, and Lamborn for Congress.  Plaintiffs ask the Court to issue a

mandatory preliminary injunction requiring defendant Wayne W. Williams, the Secretary

of State for the State of Colorado, to certify Congressman Lamborn for the ballot in the

Republican primary election to the U.S. House of Representatives in the Fifth

Congressional District.  Docket No. 2 at 1.

## I.  FINDINGS OF FACT

Plaintiff Douglas Lamborn is a candidate for the U.S. House of Representatives

for the Fifth Congressional District.  He is also the incumbent, having been first elected in 2006.  Docket No. 1 at 6.  Lamborn for Congress is the authorized campaign committee for Congressman Lamborn and is registered as a federal political committee with the Federal Elections Commission.  *Id*.  Plaintiff Ryan Mark Tipple is a registered Colorado voter, affiliated with the Republican Party.  Mr. Tipple collected nominating signatures on behalf of Congressman Lamborn for the primary election in 2018 and wants to collect signatures for nominating petitions in Colorado in the future.  *Id.* at 6. He currently resides in the State of California.  *Id*.  Signatures that Mr. Tipple collected on behalf of Congressman Lamborn in 2018 were declared invalid by the Colorado Supreme Court on April 23, 2018 because Mr. Tipple was not a resident of the State of Colorado at the time he collected the signatures.

Plaintiffs Melissa Renee and Jeremy Wayde Goodall are registered Colorado voters, affiliated with the Republican Party, who reside in the Fifth Congressional District.  *Id.* at 3.  They signed a nominating petition for Congressman Lamborn circulated by Mr. Tipple, which was declared invalid.  *Id*.  They are also petition circulators.  Plaintiffs Shauna Leigh and Jeffery Phillip Arrington and Karla Jo Kroeker are registered Colorado voters, affiliated with the Republican Party, who reside in the Fifth Congressional District.  *Id.*  They signed a nominating petition for Congressman Lamborn circulated by Mr. Tipple, which was declared invalid.  The Arringtons and Ms. Kroeker are not petition circulators.  As a result of the invalidation of the petitions circulated by Mr. Tipple, the signatures of the Goodalls, the Arringtons, and Ms. Kroeker will not be counted in the primary election.  *Id.*

2

Colorado law provides two means by which a major party candidate can gain access to the primary ballot for public office: by collecting signatures on nominating petitions or by a certification of designation of the political party.[1]  *Id.* at 12.  Candidates for the U.S. House of Representatives who seek to be placed on the primary ballot through the nominating petition process must collect 1,000 signatures from eligible electors residing in the congressional district and who are affiliated with the same political party.  *Id.*; Colo. Rev. Stat. § 1-4-801.  There are 200,000 registered Republicans in the Fifth Congressional District.

Congressman Lamborn decided to run for reelection and, on December 23, 2017, he submitted information to the Secretary of State's Office in order for the Secretary to prepare a petition format that Congressman Lamborn could use to gain access to the primary ballot through the petition process.  Exhibit 5 to April 30, 2018 Preliminary Injunction hearing.[2]  The Secretary approved Congressman Lamborn's petition format on January 3, 2018, noting, among other things, that "petition circulators must be Colorado residents."  Exhibit 6.  Candidates for the Fifth Congressional District could collect signatures between January 16, 2018 and March 20, 2018, *id.*, a total of 63 days.  Congressman Lamborn used 13 circulators to collect signatures for his nominating petitions.  On March 6, 2018, he turned in his nominating petitions to the Secretary of State.  Docket No. 1 at 14.  On March 29, 2018, the Secretary of State

---

[1]  A candidate may also survive the primary election through write-in votes, but testimony at the hearing established that no major party candidate in Colorado has ever gained access to the general election ballot through write-in votes.

[2] Exhibits cited in this order are exhibits admitted at the April 30, 2018 preliminary injunction hearing.

found that 1,269 signatures of the 1,783 signatures submitted were valid.  *Id*.  Because this number was more than the 1,000 signatures needed, the Secretary determined that Congressman Lamborn had obtained a sufficient number of signatures to be placed on the ballot for the June 26, 2018 primary election and issued a Statement of Sufficiency. Exhibit 3.

The Secretary uses the following procedures in reviewing signature petitions. Once a candidate submits his or her petitions to the Secretary for review, the Secretary of State's Office takes the petitions to a division of the Department of Personnel Administration in Pueblo.  The petitions are electronically scanned.  First, the reviewers check the circulator's affidavit for facial validity, including whether the circulator filled it out properly, signed it, and had it properly notarized.  The reviewers then run the circulator's information through the state voter registration database to determine whether that person meets the qualifications to be a circulator, such as being over 18 years old, being affiliated with the proper political party, and being a resident of Colorado.  Any problems regarding these issues are subject to a cure period wherein the candidate may attempt to correct the defects, the goal being to give every registered elector the opportunity to have his or her signature counted.  Second, the reviewers check the information on each signature line to make sure that such information matches the information in the voter registration database for that person. This process determines whether the person was eligible to sign the petition.  The second step also includes a signature verification procedure that Colorado is implementing for the first time this year, wherein the signature on the petition is compared, through the Secretary's electronic voter registration database, to the most

4

recent signature for that voter.   These signatures may include the signature of a voter on the back of a previously submitted mail-in ballot.  If, in the opinion of the trained reviewers, the signatures match, the Secretary accepts the otherwise valid signature.  If not, that signature is subjected to an additional level of review whereby at least two bipartisan reviewers compare that petition signature to any other signatures of that person in the voter registration database.  If those reviewers determine that the petition signature does not match, the Secretary provides a list of the nonmatching signatures to the candidate so that the candidate can attempt to cure.

On April 3, 2018, five voters from the Fifth Congressional District filed a petition in the District Court for the City and County of Denver pursuant to Colo. Rev. Stat. §§ 1-1-113 and 1-4-909 challenging the Secretary of State's statement of sufficiency regarding Congressman Lamborn's petitions.  The petitioners claimed that seven of Congressman Lamborn's circulators did not live within the State of Colorado in violation of the residency requirement of Colo. Rev. Stat. § 1-4-905(1).[3]  Congressman Lamborn was allowed to intervene in the proceeding.  On April 10, 2018, the state district court, after an evidentiary hearing, found that one circulator was not a Colorado resident and therefore invalidated the 58 signatures that he collected.  In regard to Mr. Tipple, the court found that Mr. Tipple had every intention of becoming a Colorado resident, but

_____

[3]Colo. Rev. Stat. § 1-4-905(1) provides:

No person shall circulate a petition to nominate a candidate unless the person is a resident of the state, a citizen of the United States, at least eighteen years of age, and, for partisan candidates, registered to vote and affiliated with the political party mentioned in the petition at the time the petition is circulated, as shown in the statewide voter registration system.

just had not done so at the time he collected signatures in the state.  *Kuhn v. Williams*, No. 18SA176, at *10 (Colo. 2018) (slip op.).  The district court found that Mr. Tipple was a Colorado resident and therefore rejected petitioners' challenge as to Mr. Tipple. Petitioners then appealed directly to the Colorado Supreme Court.  The state supreme court reversed, holding that Colo. Rev. Stat. § 1-1-113(1) allowed the petitioners to mount an evidentiary challenge to the circulators' residency, despite the fact that the Secretary had already issued a statement of sufficiency on that issue, and that, based on *Gordon v. Blackburn*, 618 P.2d 668, 671 (Colo. 1980), Mr. Tipple was not a Colorado resident at the time that he collected the signatures on behalf of Congressman Lamborn.  *Kuhn*, No. 18SA176, at *19-20, *22.  The Colorado Supreme Court invalidated the 269 signatures collected by Mr. Tipple, causing Congressman Lamborn to have collected fewer than the 1,000 signatures needed to qualify him.  As a result, the Colorado Supreme Court ruled that the "Secretary may not certify Representative Lamborn to the 2018 primary ballot for CD5."  *Id*. at *25.  Moreover, although Congressman Lamborn attempted to raise the constitutionality of the residency requirement on appeal, the Supreme Court noted that, in a Colo. Rev. Stat. § 1-1-113 appeal, it lacked jurisdiction to consider such an argument.  *Id*. at *24-25. Plaintiffs filed this lawsuit on April 25, 2018.

## II.  LEGAL STANDARD

To succeed on a motion for a preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of

equities tips in the movant's favor; and (4) that the injunction is in the public interest. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 US. 7, 20 (2008)); *see Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010)).  "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (quoting *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)) (internal quotation marks omitted).  Granting such "drastic relief," *United States ex rel. Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enter. Mgmt. Consultants, Inc.,* 883 F.2d 886, 888-89 (10th Cir. 1989), is the "exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

There are three types of preliminary injunctions that are disfavored in this circuit: (1) injunctions that disturb the status quo, (2) injunctions that are mandatory rather than prohibitory, and (3) injunctions that provide the movant substantially all the relief it could feasibly attain after a full trial on the merits.  *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005).  The "status quo" for purposes of the first category is defined as "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." *Id.* at 1260 (citing *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001)).  In seeking a disfavored injunction, "the movant must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016) (internal quotation marks

and brackets omitted); *see also Schrier*, 427 F.3d at 1259 (stating that such injunctions "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course" (internal quotation marks omitted)).

### III.  ANALYSIS

Plaintiffs move for a preliminary injunction requiring the Secretary of State to certify Congressman Lamborn to the 2018 Republican Party primary ballot.  Defendant opposes the preliminary injunction on two grounds.  First, defendant argues that plaintiffs' claim is barred by the doctrine of laches because plaintiffs delayed in raising the constitutional issue.  Second, defendant contends that the four preliminary injunction factors weigh against plaintiffs' requested relief.

### A.  Laches

Defendant argues that plaintiffs' claim is barred by the doctrine of laches. Docket No. 27 at 6.  That doctrine "bars a party's dilatory claim" and "stems from the principle that equity aids the vigilant and not those who slumber on their rights." *Biodiversity Conservation Alliance v. Jiron*, 762 F.3d 1036, 1090-91 (10th Cir. 2014) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121-22 (2002), and *Kansas v. Colorado*, 514 U.S. 673, 687 (1995)).  To prevail on a laches defense, a defendant must show that there is: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense."  *Id. at 1091* (quoting *Nat'l R.R. Passenger Corp.*, 536 U.S. at 121-22).

Courts have expressed particular concern about a party bringing last minute

election-related challenges.  *See, e.g.*, *Perry v. Judd*, 471 F. App'x 219, 227 (4th Cir. 2012) (unpublished) (noting that "applications for a preliminary injunction granting ballot access have been consistently denied when they threaten to disrupt an orderly election"); *Merced v. Spano*, 2016 WL 3906646, at *3 (E.D.N.Y. July 14, 2016) (expressing concern about impact of late-filed preliminary injunction motion on electoral process).  One court noted that, "[a]s time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made." *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990).

Plaintiffs filed this lawsuit on April 25, 2018.  *See* Docket No. 1.  The deadline for the Secretary to certify candidates to the 2018 Republican primary – originally April 27, 2018 – has been postponed to May 2, 2018 pursuant to a state court order.  Docket No. 32 at 1.  The deadline for transmitting absentee and overseas ballots is May 12, 2018, and ballots to all other voters are scheduled to be distributed beginning June 4, 2018. Docket No. 31 at 14.  The Republican Party primary election is June 26, 2018.  Docket No. 1 at 2, ¶ 4.

Defendant argues that plaintiffs did not diligently pursue their claim because they waited until the eve of the Secretary's certification deadline to file this lawsuit.  Docket No. 27 at 9.  Specifically, defendant contends that plaintiffs could have brought their claims years ago or, at the latest, when the petitioners in the state-court action filed their lawsuit on April 3, 2018.  *Id.*  Defendant also asserts that plaintiffs' delay has resulted in prejudice to both the Secretary and the public at large.  First, the Secretary argues that it has had to "scramble" to defend against plaintiffs' lawsuit with only a few

9

days left before the ballot certification deadline.  *Id.* at 9.  Second, the Secretary claims that the lawsuit could disrupt the orderly administration of the election and cause the Secretary to miss deadlines, such as the ballot certification deadline on May 2, 2018. *Id.* at 9-10.  Finally, at the evidentiary hearing on April 30, 2018, defendant expressed broader concerns about judicial intervention at this stage of the electoral process.  In particular, defendant noted that the granting of a preliminary injunction could (1) result in the application of different standards to different candidates, (2) encourage future eleventh-hour challenges to ballot access requirements, and (3) cause voter confusion.

Plaintiffs assert that they were justified in bringing their constitutional claim on April 25, 2018 because the Colorado Supreme Court's April 23, 2018 decision in *Kuhn v. Williams* unexpectedly altered the status quo on two fronts: first, by interpreting § 1-1-113 to allow evidentiary challenges to the residency of a petition circulator after the Secretary has issued a statement of sufficiency as to that circulator's residency and signatures; and second, by holding that residency for purposes of § 1-4-905(1) must be determined according to objective factors.  Plaintiffs contend that, until the Colorado Supreme Court's decision in *Kuhn*, they could not reasonably have known of the possibility that the signatures gathered by Mr. Tipple and deemed sufficient by the Secretary of State would be invalidated due to noncompliance with § 1-4-905(1)'s residency requirement.

Despite the Court's concerns about the diligence of Congressman Lamborn and his campaign, the Secretary's laches defense fails as to the second prong – prejudice. *See Ute Indian Tribe of Uintah and Ouray Reservation v. Probst*, 428 F.2d 491, 497

(10th Cir. 1970) (rejecting laches defense based on defendant's inability to show prejudice); *List Interactive, Ltd. v. Knights of Columbus*, No. 17-cv-00210-RBJ, 2018 WL 1399913, at *8 (D. Colo. Mar. 20, 2018) (finding that laches argument "also fail[ed]" because defendant could not point to any prejudice resulting from delay); *see also Nature Conservancy v. Wilder Corp. of Delaware*, 656 F.3d 646, 651 (7th Cir. 2011) (declining to address whether plaintiff's delay in adding claim was unreasonable because defendant had failed to show that delay caused any material prejudice, as required under Illinois law).[4]   Defendant claims that the Secretary has had to scramble to defend against this lawsuit, which is undoubtedly true.   However, there has been no suggestion that defendant would have altered his litigation strategy had plaintiffs filed their complaint three weeks earlier, after the *Kuhn* petition was filed.   The Secretary has

---

[4]Although the Court ultimately finds that defendant has not carried its burden of demonstrating prejudice as to its laches defense, the Court agrees with defendant that Congressman Lamborn, the Lamborn campaign, and the circulator plaintiffs should have asserted their constitutional claims long before April 2018.   *See Perry*, 471 F. App'x at 224 (finding that long-standing circulator residency requirement caused candidate cognizable injury no later than the day on which he declared his candidacy). That is not true as to plaintiffs Shauna Leigh Arrington, Jeffery Phillip Arrington, and Karla Jo Kroeker, who signed a petition circulated by Mr. Tipple, but are not circulators themselves.   As the Secretary argued to the Colorado Supreme Court in the *Kuhn* case,

> [a]n elector should be able to sign a petition, thereby expressing support for allowing the candidate's name to appear on the ballot, without having to worry that subsequent challenges to the circulator's residency will discount all of the petition signers.   That is particularly true in the new era of signature verification, which ensures that a candidate's support comes from real people irrespective of the circulator's residence or registration status.

Secretary's Brief at 21, *Kuhn v. Williams*, No. 18SA176 (Colo. 2018) (slip op.). Nevertheless, the Arringtons and Ms. Kroeker should have filed their constitutional claims shortly after the *Kuhn* petitioners filed their Colo. Rev. Stat. § 1-1-113 petition.

not argued that he needed more time to develop his laches defense.  And while the

Secretary argues that he could not properly prepare for the preliminary injunction

hearing, since there has been no time for discovery or for developing expert testimony,

the Secretary did not explain what type of discovery he would have sought, how such

discovery could have influenced the standard of review applicable to plaintiffs'

constitutional claims, or how such discovery would have otherwise altered his

constitutional argument.  Thus, the Secretary does not show how a claim filed three

weeks earlier would have obviated any prejudice he suffers.

Defendant next suggests that plaintiffs' delay could cause the Secretary to miss

important deadlines with regard to the election process.  That is not apparent to the

Court.  This order is being entered before the Secretary's deadline for certifying

candidates to the 2018 Republican primary election ballot.  The Secretary has already

issued a statement of sufficiency regarding Congressman Lamborn.  The Secretary has

not identified any logistical impediment to his ability to certify Congressman Lamborn to

the 2018 Republican Party primary ballot by the May 2 deadline.

Finally, defendant contends that the issuance of a preliminary injunction may

have "unpredictable collateral consequences" for Colorado's electoral process.  The

Court is sympathetic to defendant's concern.  As the Fourth Circuit recognized in *Perry*,

"[b]allots and elections do not magically materialize.  They require planning,

preparation, and studious attention to detail if the fairness and integrity of the electoral

process is to be observed."  471 F. App'x at 226; *see also id.* at 225 (discussing

adverse consequences of permitting candidates to file last-minute challenges to state

election laws).  As with defendant's other prejudice arguments, however, defendant has

12

failed to explain how such concerns are implicated in this case.  Although defendant referred at oral argument to two pending state court cases that apparently involve the circulator residency requirement, defendant has offered no explanation as to what effect an adverse ruling in this case would have on the litigants in those proceedings. Additionally, defendant asserts that a preliminary injunction in this case could result in voter confusion.  But in his opposition to the motion to intervene, defendant argued that, "[w]hile it is true that provisionally placing Rep. Lamborn on the ballot might lead to confusion if he were later disqualified, the schedule in this case does not call for that temporary remedy because the preliminary injunction hearing will be completed before the ballot certification deadline."  Docket No. 13 at 6.

Defendant has not otherwise articulated or introduced any evidence of actual prejudice caused by plaintiffs' delay in filing this lawsuit.  Accordingly, defendant has not shown that the doctrine of laches bars plaintiffs' claims.  *Compare Perry*, 471 F. App'x at 227 (finding that prejudice prong had been satisfied where "most of the printing ha[d] already been authorized or completed," preliminary injunction would have "force[d] expensive reprinting of ballots," and reprinting in conjunction with other delays would have likely "prevent[ed] respondents from complying with their obligations under federal and state law"); *Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980) (finding that application of laches was appropriate where, during the two weeks in which plaintiff delayed filing his lawsuit, state carried out all its preliminary work for the "paper ballots, voting machine strips, and punch cards" and completed and shipped "notices of election, absentee voting material, and registration notices").

13

### B.  Preliminary Injunction Factors

Because plaintiffs are seeking a disfavored injunction, *see Perry*, 471 F. App'x at

223 (finding that, where candidate sought mandatory injunctive relief, such request is

"disfavored, and warranted only in the most extraordinary circumstances" (quoting *In re*

*Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)), they are entitled to

relief only if they "make a strong showing both with regard to the likelihood of success

on the merits and with regard to the balance of harms."  *Fish*, 840 F.3d at 724.

### 1.  Likelihood of Success on the Merits

Plaintiffs assert that they are likely to succeed on the merits of their First

Amendment claim because the circulator residency requirement in Colo. Rev. Stat. § 1-

4-905(1) is a clear violation of their free speech rights.  Docket No. 2 at 6.

It is well established that states "may, and inevitably must, enact reasonable

regulations of parties, elections, and ballots to reduce election- and campaign-related

disorder."  *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (citing

*Burdick v. Takushi*, 504 U.S. 428, 433 (1992)).  However, a state's power to regulate its

elections is constrained by the Constitution.  *See Williams v. Rhodes*, 393 U.S. 23, 29

(1968).

The First Amendment provides that "Congress shall make no law . . . abridging

the freedom of speech."  U.S. Const. amend. I.  This provision "protects the right of

citizens to associate and to form political parties for the advancement of common

political goals and ideals," *Timmons*, 520 U.S. at 357, and to "engage in discussions

concerning the need for [political change]."  *Yes on Term Limits, Inc. v. Savage*, 550

F.3d 1023, 1027 (10th Cir. 2008) (quoting *Meyer v. Grant*, 486 U.S. 414, 421 (1988)). In assessing whether a state election law violates the First Amendment, a court must "weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons*, 520 U.S. at 358 (quoting *Burdick*, 504 U.S. at 434). In other words, the "rigorousness of [a court's] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. When a state regulation imposes "severe restrictions" on First Amendment rights, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Id.* (internal quotation marks). However, when the election law imposes only "reasonable, nondiscriminatory restrictions" on First Amendment rights, a state "need not establish a compelling interest to tip the constitutional scales in its direction." *Id.* at 434, 439.

The Tenth Circuit has recognized that "petition circulation is core political speech, because it involves interactive communication concerning political change." *Yes on Term Limits, Inc.*, 550 F.3d at 1028 (quoting *Chandler v. City of Arvada*, 292 F.3d 1236, 1241 (10th Cir. 2002)) (ellipses omitted).[5] Accordingly, "First Amendment

---

[5]Although *Yes on Term Limits, Inc.* involved residency requirements for circulators of initiative petitions, the Court discerns no distinction between initiative petitions and candidate petitions in terms of the importance of the speech involved or the impact of a circulator residency requirement on free speech rights. *See Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 148 (2d Cir. 2000) (finding distinction between initiative petition circulators and candidate petition circulators to be "strained"). As the Second Circuit has found, "[t]here is no basis to conclude that petition circulation on behalf of a candidate involves any less interactive political speech

protection for this activity is at its zenith." *Id.* (internal quotation marks omitted).

Additionally, courts in this circuit have applied strict scrutiny "where the government

restricts the overall quantum of speech available to the election or voting process," such

as by placing limitations on "the available pool of circulators or other supporters of a

candidate or initiative." *Campbell v. Buckley*, 203 F.3d 738, 745 (10th Cir. 2000). In

*Yes on Term Limits, Inc.*, for example, the Tenth Circuit held that a state ban on non-

resident circulators of initiative petitions was subject to strict scrutiny because it limited

the quantum of speech available in the election process. *See* 550 F.3d at 1028; *see

also Buckley v. Am. Constitutional Law Foundation, Inc.*, 525 U.S. 182,194-97 (1999)

(striking down circulator registration requirement after finding that it "decrease[d] the

pool of potential circulators").

    This case is analogous to *Yes on Term Limits, Inc.* Not only do plaintiffs seek to

participate in the same core political speech – petition signing and circulation – but the

residency requirement in § 1-4-905(1), like the regulation at issue in *Yes on Term

Limits, Inc.*, operates to reduce the pool of available circulators and limit the quantum of

speech in the election process. Tenth Circuit precedent therefore instructs that strict

scrutiny is the appropriate standard to apply. *See Yes on Term Limits, Inc.*, 550 F.3d at

1028.

    Defendant argues that strict scrutiny is not applicable in this case for two

reasons. First, defendant suggests that the residency requirement does not impose a

_____

than petition circulation on behalf of a proposed ballot initiative – the nature of the
regulated activity is identical in each instance." *Id.*; *accord Libertarian Party of Virginia*,
718 F.3d at 314 n.5; *see also Buckley*, 525 U.S. at 191 ("Initiative-petition circulators
also resemble candidate-petition signature gatherers [ ], for both seek ballot access.").

severe burden on speech because Congressman Lamborn, to gain access to the ballot, had to gather just 1,000 signatures in a district of over 200,000 registered Republicans. Docket No. 27 at 13.  The Court finds this argument unpersuasive.  Defendant does not identify any authority for the proposition that ease of ballot access is sufficient, by itself, to mitigate the burdens imposed by a restriction on the available pool of circulators. Moreover, such an argument construes plaintiffs' claim too narrowly.  As the Fourth Circuit recognized in *Libertarian Party of Virginia v. Judd*, a focus on a candidate's success accessing the ballot "ignores the means by which that end has been, and is, achieved."  718 F.3d 308, 314 (4th Cir. 2013).  Even if it is true that Colorado's 1,000-signature requirement does not pose a significant obstacle to a candidate's ability to access the ballot, there would be more circulators available to "approach and attempt to persuade an even larger audience" in the absence of § 1-4-905(1)'s residency requirement.  *Id.* at 315.  Moreover, "[t]he First Amendment protects [individuals'] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing."  *Meyer v. Grant*, 486 U.S. 414, 424 (1988); *see also Nader v. Brewer*, 531 F.3d 1028, 1036 (9th Cir. 2008) (finding that strict scrutiny applied to circulator residency requirement, even though "there remain[ed] millions of potential Arizona circulators," because it "exclude[d] from eligibility all persons who support[ed] the candidate but who . . . live[d] outside the state").

At the preliminary injunction hearing, defendant also contended that the Court is not in a position to apply strict scrutiny absent an evidentiary showing that the residency requirement imposes severe burdens on plaintiffs' First Amendment rights.  The Court disagrees.  Although decisions such as *Buckley* and *Meyer* cited evidence in support of

the conclusion that restrictions on petition circulators are subject to strict scrutiny, *see Buckley*, 525 U.S. at 194 (citing "uncontested numbers" in the record showing that circulator registration requirement "decrease[d] the pool of potential circulators"); *Meyer*, 486 U.S. at 422-23 (finding that prohibition against paying circulators of initiative petitions was subject to strict scrutiny based on evidence that law (1) "limit[ed] the number of voices who [would] convey appellees' message" and (2) "ma[de] it less likely that appellees [would] garner the number of signatures necessary to place the matter on the ballot"), more recent cases have recognized a judicial "consensus" that such restrictions impose severe burdens on speech. *See, e.g., Wilmoth v. Sec'y of State of New Jersey*, 2018 WL 1876021, at *3-4 (3d Cir. 2018) (applying strict scrutiny in light of general "consensus" among circuits that "laws imposing residency restrictions upon circulators of nomination petitions are subject to strict scrutiny analysis"); *Libertarian Party of Virginia*, 718 F.3d at 316-317 ("As the law has developed following the Supreme Court's decisions in [*Meyer v. Grant* and *Buckley v. American Constitutional Law Foundation*], a consensus has emerged that petition restrictions like the one at issue here are subject to strict scrutiny analysis."). The Third, Fourth, and Tenth Circuits have all reached the conclusion that strict scrutiny applies to circulator residency requirements without relying on any record evidence regarding the burdens that such requirements impose on First Amendment rights. *See Wilmoth*, 2018 WL 1876021, at *3-4; *Libertarian Party of Virginia*, 718 F.3d at 316-17; *Yes on Term Limits, Inc.*, 550 F.3d at 1028.

Because the Court finds that strict scrutiny is the appropriate standard of review

under Tenth Circuit precedent, the burden shifts to defendant to show that "its ban on non-resident circulators is narrowly tailored to serve a compelling state interest." *Yes on Term Limits, Inc.*, 550 F.3d at 1028 (citing *Republican Party of Minn. v. White*, 536 U.S. 765, 774-75 (2002)).  The Secretary asserts that he has a compelling interest in protecting the integrity and reliability of Colorado's election processes.  *See* Docket No. 27 at 15.  The Court finds that this constitutes a compelling state interest.  *See Chandler*, 292 F.3d at 1241 (recognizing that municipality had a "compelling interest in policing the integrity of its petition process").  Nevertheless, the Secretary cannot show that § 1-4-905(1)'s residency requirement is narrowly tailored to serve that interest.

The Secretary argues that the residency requirement helps to reduce circulator fraud.[6]  To support this argument, the Secretary has introduced the declaration of Abby K. Wood, an associate professor of law, political science, and public policy at the University of Southern California.  Docket No. 35-1 at 1.  Professor Wood's declaration

---

[6]The Secretary contends that "[t]he residency and registration requirements at issue in this case are also narrowly tailored because any other ostensibly lesser-restrictive means would have the potential to infringe on the constitutional rights" of the major political parties and their representatives to choose a "candidate-selection process that will in their view produce the nominee who best presents its political platform."  Docket No. 27 at 18 (quoting *N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 203 (2008)) (brackets omitted).  The Secretary did not press this argument at the preliminary injunction hearing.  In any event, the existence of competing interests does not give state legislatures license to infringe on the constitutional rights of other participants in the electoral process.  *See N.Y. State Bd. of Elections*, 552 U.S. at 202-03 (noting that party's rights to choose "candidate-selection" process "are circumscribed [ ] when the State gives the party a role in the election process"); *cf. Buckley*, 525 U.S. at 190 (affirming Tenth Circuit's reversal of district court decision finding that registration requirement was "not subject to any level of scrutiny" because it had been "adopted by Colorado's voters as a constitutional amendment"); *see also id.* at 194 (quoting Tenth Circuit's statement that "voters may no more violate the United States Constitution by enacting a ballot issue than the general assembly may by enacting legislation").

opines that, "[a]t least in theory, preventing out-of-state circulators can help to protect the integrity of the election and prevent fraud, simply because in-state circulators will feel the effects of votes cast by the candidate if elected." *Id.* at 3.[7]  She also states that, "all else equal, the expected cost of committing fraud is lower for out of state residents." *Id.*  However, Professor Wood cites no evidence for her opinions, and courts have found that the frequency of fraud by in-state and out-of-state circulators is the same. *See, e.g.*, *Yes on Term Limits, Inc.*, 550 F.3d at 1029 (finding that record did "not support the district court's conclusion that non-resident circulators as a class engage in fraudulent activity to a greater degree than resident circulators").  Accordingly, the Court does not find Professor Wood's opinions persuasive.

Moreover, the Secretary's concerns about circulator fraud are largely obviated by Colorado's new process for verifying signatures on candidate petitions.  Under Colo. Rev. Stat. § 1-4-908(1.5)(a),

> [i]n any election conducted after January 1, 2018, for any petition that must be filed in accordance with the secretary of state in accordance with section 1-4-907, the secretary of state shall compare each signature on a candidate petition with the signature of the eligible elector stored in the statewide voter registration system.

If a mismatch is detected, "or if a signature verification device is unable to determine that the signatures match, a second review shall be made by an employee of the secretary of state's office or a designee trained in signature verification."  § 1-4-

---

[7] Citing the "alignment approach" of fostering political alignment between constituencies and representatives, Professor Wood also claims that the residency requirement of Colo. Rev. Stat. § 1-4-905(1) "should have the effect of improving alignment [ ] because it prohibits involvement by out-of-state actors."  Docket No. 35-1 at 5.  But Professor Wood cites no court that has acknowledged the theory, which runs counter to the jurisprudence cited in this order on residency requirements.

20

908(1.5)(b)(I).

Ben Schler, the legal and policy manger for the Secretary of State's Office, testified at the preliminary injunction hearing that, despite the implementation of this signature verification process, the residency requirement is still important because residency information enables the Secretary of State's Office to confirm whether a circulator complies with other requirements listed in § 1-4-905(1), such as the minimum age and citizenship requirements.  In addition, he stated that the residency requirement facilitates the state's and candidates' access to circulators in the event there is a deficiency in a candidate's petition.  However, neither of these arguments relates to the issue of fraud.

The Secretary also argues that the residency requirement ensures that the state can subpoena a circulator and compel him to "travel to and attend a hearing" within a short time frame in the event that there is a contest over a petition's sufficiency.  Docket No. 27 at 17.  Courts have routinely found that requiring circulators to sign affidavits or enter into agreements in which they "provide their relevant contact information and agree to return in the event of a protest" is a more narrowly tailored means of ensuring a state's ability to locate circulators than is a residency requirement.  *Yes on Term Limits, Inc.*, 550 F.3d at 1030; *Chandler*, 292 F.3d at 1244 (noting that less restrictive approach would be to "require . . . , as a prerequisite to circulating an initiative, referendum, or recall petition in the City, the prospective circulator agree to submit to the jurisdiction of the Arvada Municipal Court").  Colorado has already implemented this requirement.  *See* Colo. Rev. Stat. § 1-40-111(2)(a) (requiring circulator to execute affidavit attesting to compliance with § 1-4-905(1)'s requirements and certifying that "he

21

or she understands that failing to make himself or herself available to be deposed and to provide testimony in the event of a protest shall invalidate the petition section if it is challenged on the grounds of circulator fraud"). To the extent residency is used as an easy way to ascertain a circulator's compliance with the other requirements in § 1-4-905(1), the Court is unable to perceive why § 1-40-111(2)(a) does not adequately achieve this same interest. The residency requirement itself is not a narrowly tailored means to accomplish the goal of locating circulators or gaining their testimony.

In summary, the Secretary fails to demonstrate that the residency requirement is narrowly tailored to protecting the integrity of the petition process. Accordingly, the Court finds that plaintiffs have made a strong showing that they are likely to succeed on the merits of their First Amendment claim.

### 2. Remaining Preliminary Injunction Factors

As to the issue of irreparable harm, Congressman Lamborn claims that, unless an injunction issues, his name will not appear on the primary ballot and he will lose his ability to seek re-election. Docket No. 2 at 11. The plaintiffs who signed petitions submitted by Mr. Tipple claim that they will be irreparably harmed by not having their signatures counted and, as a result, will not be able to vote for Congressman Lamborn in the primary election. *Id.* at 11-12. In response, the Secretary argues that Congressman Lamborn and the plaintiffs who voted for him may still mount a write-in campaign. Docket No. 27 at 19. Given that no major political party candidate has ever successfully won a primary based on write-in votes, the Court finds that this factor weighs heavily in favor of plaintiffs.

As to whether plaintiffs have shown that the threatened injury to them outweighs

the injury caused by the injunction and whether the injunction would be adverse to the public interest, the Secretary claims that "the entire election administration process used by the Secretary to validate submitted signatures will be called into question." *Id.* at 19.  However, the Court discerns no such possible deleterious effect on the Secretary's signature verification system, which appears to be working efficiently and effectively.  The Secretary also claims that "[o]ther disqualified candidates may similarly seek court orders to place them on the primary ballot," *id.* at 20, but the Secretary has not identified any other candidates who, like Congressman Lamborn, would have qualified for the primary ballot but for the residency requirement.  Finally, the Secretary argues generally that changing the election rules midstream could shake the confidence in the integrity of our electoral system.  *Id.* at 20.  While the Secretary appropriately has concerns about the integrity of the election system, which he is charged with administering and which constitutes a compelling interest of the State, that concern is lessened here.  First, there is no dispute that the contested signatures were the signatures of qualified electors that were invalidated solely because of the likely unconstitutional residency requirement.  The State has no legitimate interest in an unconstitutional provision.  Second, this Court declared a similar residency provision in Colo. Rev. Stat. § 1-40-112(1) concerning issue petitions unconstitutional in *Independence Inst. v. Gessler*, 936 F. Supp. 2d 1256 (D. Colo. 2013), and enjoined the Secretary from enforcing it.  *Id.* at 1281.  It cannot come as a surprise that a person prejudiced by the residency requirement in Colo. Rev. Stat. § 1-4-905(1) would challenge its constitutionality under *Yes on Term Limits, Inc.*, yet the State has not

23

taken steps to remove this requirement.  The Court finds that both of the final two preliminary injunction factors weigh strongly in favor of plaintiffs and that, overall, plaintiffs have made a sufficient showing to justify the issuance of a mandatory injunction.

## IV.  CONCLUSION

Wherefore, it is

**ORDERED** that plaintiffs' Motion for Preliminary Injunction [Docket No. 2] is **GRANTED**.  It is further

**ORDERED** that defendant Wayne W. Williams is preliminarily enjoined and restrained from enforcing that portion of Colo. Rev. Stat. § 1-4-905(1) that requires that petition circulators be residents of the State of Colorado.  It is further

**ORDERED** that defendant Wayne W. Williams shall certify Douglas Lamborn to the 2018 Republican primary ballot for the Fifth Congressional District unless, for reasons other than the residency requirement discussed in this order, he does not qualify.  It is further

**ORDERED** that, pursuant to Fed. R. Civ. P. 65(c), the Court will not require the posting of a bond in this matter.  It is further

**ORDERED** that this order will remain in effect pending final disposition of plaintiffs' lawsuit or further order of this Court.

DATED May 1, 2018, at 2:55 p.m.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge